IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

JASON DANE HARRIS and            )
RACHAEL MARIE DABBS              )
HARRIS, as next friend of P.D.H.,  )
on behalf of themselves and all     )
others similarly situated,           )
                                    )
          Plaintiffs,               )   CIVIL ACTION NO. CV: 13-00076-KOB
v.                                  )
                                    )
FISHER-PRICE, INC., MATTEL,          )
INC., et al.,                       )
                                    )
          Defendants.               )

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

I.      STATEMENT OF ISSUES AND SUMMARY OF ARGUMENT ................5

II.     STATEMENT OF FACTS............................................................................6

III.    LEGAL STANDARD..............................................................................14

IV.     ARGUMENT............................................................................................16

V.      CONCLUSION.........................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods., Inc. v. Windsor Prods.*,
521 U.S. 591 (1997)……………………….…………………………......11

*Amgen, Inc., v. Connecticut Retirement Plans and Trust Funds*,
133 S.Ct. 1184 (2013)……………….………………..……………...11

*Cox v. Am. Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir.1986)………………………………………......13

*Edmondson v. Simon*,
86 F.R.D. 375, 380–81 (N.D.Ill. 1980)…………………………………16

*Evans v. U.S. Pipe & Foundry Co.*,
696 F.2d 925 (11th Cir. 1983)……………………………..……………13

*Grimes v. Rave Motion Pictures Birmingham, L.L.C.*,
264 F.R.D. 659 (N.D. Ala. 2010)………………………………………......11

*Hudson v. Delta Air Lines, Inc.*,
90 F.3d 451 (11th Cir. 1996)……………………………………………14

*In re Miller Indus., Inc., Sec. Litig.*,
186 F.R.D. 680 (N.D.Ga. 1999)…………………………………………15

*In re Vesta Ins. Group, Inc., Sec. Litig.*,
1999 WL 34831475 (N.D.Ala. 1999)..…………………………...……17

*In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation*,
722 F.3d 838 (6th Cir. 2013)……………………………………………...15

*Jackson v. Motel 6 Multipurpose, Inc.*,
130 F.3d 999 (11th Cir. 1997)…………………………………………18

*Kilgo v. Bowman Transp., Inc.*,
789 F.2d 859 (11th Cir. 1986)…………………………………………..13

*Klay v. Humana, Inc.,*
     382 F.3d 1241 (11th Cir. 2004)………………………………………..20

*Ouellette v. International Paper Co.,*
     86 F.R.D. 476 (D.Vt. 1980)…………………………………….…..16

*Tolbert v. Western Elec. Co.,*
     56 F.R.D. 108 (N.D.Ga.1972)…………………………...……....14

*Wal–Mart Stores, Inc. v. Dukes,*
     564 U.S. ------, -------, 131 S.Ct. 2541, 2551,
     180  L.Ed.2d 374 (2011).........................................................................11

*Wyatt v. Poundstone,*
     169 F.R.D. 155 (M.D. Ala. 1995)………………….………………17

## RULES

Federal Rules of Civil Procedure

     Rule 23(a)……………………………..………………………....6

     Rule 23(a)(1)…...……………………………………………….14

     Rule 23(a)(2)……………………………..…………………......16

     Rule 23(a)(3)…………………….……………………………16, 17

     Rule 23(b)(3)……………..........…………………..6, 12, 18, 20, 21, 23

     Rule 23(c)(1)…………………….…..…………………….........14

# I.     STATEMENT OF ISSUES AND SUMMARY OF ARGUMENT

Plaintiffs ("Plaintiffs") allege that Defendants marketed and sold to them –
and many other consumers – a baby seat/crib they knew to be defective. Rather
than disclose the problem so that consumers could make an informed choice, the
Defendants opted to conceal the defect from everyone. When consumers
experienced mold problems – and they did, the Defendants blamed the problem on
the consumers, and tried to shift the burden of dealing with it to them (even though
consumers could not themselves fix the fundamental design defect).

This case arises out of Defendants' marketing and sale of the Rock 'N' Play
Sleeper ("Sleeper"). Due to a uniform and inherent design defect, the Sleepers
developed mold. The Defendants failed to prevent and/or eliminate the mold that
would develop underneath the cushioned pad in the seat of the Sleeper.

The Defendants knew of this defect and the mold problems, but uniformly
failed to disclose them to Plaintiffs and consumers generally. To establish the
Defendants' liability for these claims, each Class member would have to marshal
evidence of, and prove, the same core facts relating to the defect and Defendants'
knowledge, including that:

- The Defendants knew that the Sleeper was defectively designed
  and would experience mold problems. One of the inventors, Justin
  Taton was informed of complaints of mold growth on October 20,
  2010 and responded in an e-mail that additional holes should be
  put on the seat insert since he suspected that *"that liquid from the
  baby is collecting in the seat insert."* (Ex. 6)

- On November 10, 2011 one of the co-inventors (Margo Moulin - Project Engineer, Softgoods) wrote in an internal e-mail, "[w]*e are getting complaints of a black mold found on the sling after the child has been using the product. The child appears to provide the climate for mold growth – heat, humidity and a source of organic matter. Parents are not able to wash this mold because it is trapped in the fibers of the sling fabric.*" (Ex. 9) The next day, November 11, 2011, Moulin wrote in an e-mail "*….ultimately we would like to redesign the product so that there are no areas which must be surface washed, but this will take additional development time.*" *Id.*

- Despite Defendants' knowledge that the Sleepers experienced mold problems as a result of a common design defect, Defendants material information concerning the defect from customers.

Plaintiffs hereby seek certification of a multi-state class, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure (subject to exclusions defined *infra*).

Accordingly, and for the reasons set forth below, Plaintiffs respectfully request that the Court grant their motion for class certification.

## II.    STATEMENT OF FACTS

1.    The Rock 'N' Play Sleeper is a device that was developed in 2008 by Fisher-Price and first sold by Fisher-Price on October 2, 2009. Declaration of C. Pilarz at ¶ 7.  (Ex. 3)  The Sleeper was designed by the Fisher-Price Baby Gear Group in East Aurora, New York. *Id.* at ¶6.  A U.S. patent application for the Sleeper was initially filed on December 22, 2009.  Patent Application, (Ex. 4)

2.     The initial design of the Sleeper included a soft fabric hammock. The Fisher Price safety committee rejected this idea early on due to concerns that a hammock does not contain a baby's body in proper position, but instead could allow the baby's chin to become pressed against his chest, thus restricting his airway. (Ex. 3) ¶ 7.  All the Sleeper models at issue in this case are virtually identical.

3.     To eliminate the dangers presented by a hammock design, a plastic insert was developed. Because the Fisher Price safety committee wanted to prevent parents from using the Sleeper without the plastic insert (thus creating a hammock), the plastic insert was placed inside the fabric of the sling to ensure that it could not be removed. The design team chose fabric for the sling that would be strong and stable, to support the weight of the baby in a portable product. (Ex. 3) ¶ 8.

4.     The product instructions provided with the Sleeper stated that the "pad [is] machine washable," but never stated that it was necessary to wash or remove the pad, nor did the instructions state that any care was required for the non-removable sling portion of the seat. Ex. 2 at 8. Further, the product instructions stated that consumers should "not use bleach" on either the seat pad or frame of the Sleeper, and that instruction is repeated on the product's tags. *Id.*

5.     Despite Defendants' knowledge that the Sleeper would be routinely exposed to moisture, however, they failed to test the Sleeper itself prior to release for either mold growth or humidity resistance, even though they knew the seat would be routinely moist and warm, conditions which encourage mold growth. Ex. 9.

6.     Approximately one year after the product was launched, a customer relations employee (Colleen Hattler) at Fisher-Price was told that the Defendants "have received several calls that consumers are discovering black mold between the pad/liner." Ex. 6. Ms. Hattler then ran a report which showed 14 cases had been reported. *Id.* Ms. Hattler sent an email to Justin Taton (copied to Margo Moulin, Project Engineer) which asked if he was aware of the problem. *Id.* Mr. Taton confirmed that he was aware of the problem. *Id.* Three weeks later Taton arrived at the following conclusion then directed a design change without performing any tests:

> My guess is that liquid from the baby is collecting in the seat insert. To fix this problem, I would like to add 3 drain holes in the insert as show. Please advise when this modification can be completed. I would like the mold change [for the seat insert] done by the [sic] 11/15.

Ex. 6.

7.     The Consumer Products Safety Commission ("CPSC") first contacted Defendants about mold growth on the Sleeper on November 8, 2011. (Ex. 3) ¶ 19. At this time, the CPSC informed Defendants that a mold had already been reported

to the CPSC directly from a consumer. *Id.* Defendants responded by submitting a §15(b) report, as required by the Consumer Product Safety Act ("CPSA"), approximately 6 weeks later on December 21, 2011. *Id.*

8.    In a November 10, 2011 email, Margo Moulin writes, "[t]he committee looking into the mold issue proposes changing some of the sling materials…..and ultimately we would like to redesign the product so that there are no areas which must be surface washed, but this will take additional development time." Ex. 9. In December of 2011, Defendants engaged an independent laboratory, Bureau Veritas, to test a fabric swatch from a Sleeper returned by a consumer; Cladosporium[1] mold growth was detected. Ex. 12. The Defendants' Regulatory Project Manager, Don Fest acknowledged the mold is "not visible until/unless the consumer were to remove the seat pad … [so] the area is out of sight/out of mind." Ex. 11.

9.    The Consumer Product Safety Commission was not satisfied with Defendants' Full Report and continued to pose questions throughout 2012, which prompted Defendants to reevaluate the efficacy of the "slots" redesign, because consumers continued to report mold growth on the Sleeper with the redesigned, slotted seats. Defendants' product engineer admitted:

---

[1] The CPSC responded to a letter from the Defendants stating "Cladosporium is considered one of the most important allergenic species of mold."

[] I believe that we have had several reports after the change was made in mid 2011. . . .We have said before that *we do not believe that this change will have any affect on inhibiting mold growth*. The change was made before we fully comprehended the issue.

Ex. 16 (emphasis added).

10.    In further evaluating the mold problem, the product team determined that the fabric itself, as well as the design of the fabric covering the plastic seat, were enabling mold growth. Kitty Pilarz, Senior Director of Worldwide Product Safety at Fisher-Price and Mattel, wrote a January 5, 2011 email ("RNP Sleeper design" was the subject) to herself which stated "[o]riginally polyester was supposed to have PU coating. Got removed without our knowledge at the very beginning." Ex. 14.

11.    Adding a PU coating would have helped to inhibit mold growth on the Sleeper because,

The PU coating on Poly Pongee is oil base [sic]. It has the function of water repellent. *A PU coating will prevent moisture buildup during the product use.* Also, the fabric with low air permeability is not a good environment for mold growing and multiples [sic].

Ex. 19 (emphasis added)

12.    After numerous mold growth studies were conducted by Bureau Veritas, the Defendants engaged Dr. Ronald Gots to conduct mold testing. (Ex. 17) The CPSC rejected Dr. Gots' opinion, stating it has "serious reservations about the validity of Dr. Got's study." *Id.* The CPSC further stated that Dr. Got's study

"lacked adequate controls for reliability" and did "not mirror a realistic pattern of consumer use." *Id*. The CPSC concluded that "what was clear was that molds, including the species of Cladosporium, will grow on this product within a few days' time[,]" and Cladopsorium "***should not be in the breathing zone of infants***." *Id*. (emphasis added).

13.     Defendants finally agreed to a voluntary "recall to inspect" for the Sleeper on January 8, 2013[2] and agreed to a Corrective Action Plan with the CPSC. The so-called "recall," however, consists solely of a 16 page booklet of cleaning instructions[3] downloadable from the Internet, instructing owners to inspect the product for visible mold and, if mold is seen, undertake a laborious cleaning process that damages the product. *Id.*

14.     The recall instructions are grossly deficient. First, the "recall to inspect" does not prevent mold. It requires consumers, the vast majority of whom are not trained mycologists, to identify mold, even though mold spores are invisible to the naked eye unless millions of spores are present in a colony. If mold is found, the instructions then require that parents don gloves, goggles, and protective clothing, to clean the non-removable sling with bleach. If mold-stains persist, the instructions state that parents should soak the non-removable sling in a large tub of bleach and water. But the product instructions and tags expressly state

---

[2] Ex. 24..

[3] Ex. 5.

that bleach should not be used and will damage the product. (Ex. 2) Thus, parents must choose between damaging the product and exposing their infants to bleach, or exposing their infants to mold (or trashing the product and losing the benefit for which they bargained).

15.     Kitty Pilarz testified that the purpose of the redesign *"was to make the product more cleanable.  It wasn't to prevent the growth of mold, because there is no way to design a product that I have seen that would prevent the growth of mold if the product is not kept clean and dry."*[4]

16.     On the day of the recall, January 8, 2013, Taryn Dombroski (Customer Relations employee) sent an email to Kitty Pilarz and Don Fest which said a consumer commented on Fisher-Price's website that her Sleeper had developed mold. (Ex. 8) Pointedly, the consumer rejected Fisher-Price's position that the design change "was a parent issue vs. a company issue," and said "if it was a parent issue [Fisher-Price] wouldn't have changed the design." *Id*. Ms. Dombrowski suggested they add something about this issue to the "Q & A." *Id.* In response to Ms. Dombrowski's suggestion, Juliette Reashor of Fisher-Price said:

> "If needed, can we say something like: We designed the Rock 'N' Play Sleeper with a machine-washable, removable pad to make it easy to clean and we recently updated the design to make the cleaning process even easier for consumers."

---

[4] Pilarz Depo., page 18, lines 6-12. (Ex.18)

(Ex. 8). Seven months prior to the recall (6/5/12), while Fisher-Price was redesigning the Sleeper, Don Fest sent an email to Kitty Pilarz stating "we need to tell retailers why we're changing the product." (Ex. 10) Fest states that Fisher-Price "could explain we are enhancing and making it easier to clean, improved margins, enhanced instructions." *Id.* Moreover, Mr. Fest told Ms. Pilarz that the "message to trade is ease of washability, continuous improvement, and a change to US standards that required a product design (curiously this "alleged" change in US standards has never been mentioned by Fisher-Price's corporate representatives or counsel). *Id.*

17.     Pilarz further testified that Fisher-Price did not consider using antimicrobial or antifungal fabrics in the Sleeper,

> Q.     Did Fisher-Price look through prior to or after the
>          initial launch of the Sleeper, putting fabrics
>          antimicrobial, antifungal fabrics in the Sleeper?
>
> A.     No.

Pilarz Depo., page 18, lines 14-17 (Ex. 18)

17.     Despite Kitty Pilarz's testimony that Fisher-Price did not look at antimicrobial fibers or textile finishes, Fisher-Price produced two documents from internet searches conducted on March 7, 2012 indicating that it was looking at

antimicrobial fibers or textile finishes: Agion silver/copper ion technology[5] and SmartSilver® nanoscale fiber additives.[6] These internet searches were done approximately 3 weeks after Kelly Moore, Trial Attorney, Acting Team Lead, Children's Safe Sleep Team, CPSC notified Kitty Pilarz that "…*Cladosporium, will grow on this product within a few days' time. Cladosporium alone is considered by our experts as highly robust and potent allergen, which certainly should not be in the breathing zone of infants.*" (Ex. 17)

18.    Plaintiffs' expert, Dr. David Brookstein (a highly qualified textile engineer), in consideration of the CPSC's findings, conducted an experiment on 7 of the Sleeper fabrics utilizing artificial perspiration. After 192 hours of exposure, at room temperature, mold had developed on five of the fabrics. See Expert Report of Dr. David Brookstein, Ex. 20.  The Vartest Laboratories report of December 23, 2013 corroborated his initial opinions and, in fact, reported that four fabric samples had substantial amounts of Cladosporium mold. Ex. 21 (the same genus of mold identified by Fisher-Price's independent laboratory, Bureau Veritas - Exs. 12 and 15).

19.    Despite Defendants' knowledge of the Sleeper's susceptibility to mold growth, from October 2010 through the date of the recall in January 2013 Defendants neither warned consumers of this danger, nor provided any instruction

---

[5] (Ex. 22)
[6] (Ex. 23)

that the product required special care or cleaning. (Ex. 19); see also Pilarz Depo, pp. 31-33 (Ex. 18).

## III.  <u>LEGAL STANDARD</u>

"Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm." *Amchem Prods., Inc. v. Windsor Prods.*, 521 U.S. 591, 617 (1997) (the "very core" of the justification for a class action is offering a path to relief that otherwise would be too "paltry" for individual suit), *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[C]lass actions serve an important function in our system of civil justice.").

Last year, in *Amgen, Inc., v. Connecticut Retirement Plans and Trust Funds*, the Supreme Court declared, "the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen, Inc., v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184, 1191 (2013).

Indeed, a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (internal quotation marks omitted). Pointedly, however, the Supreme Court

recently noted that, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc.,* 133 U.S. at 2292. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

In order to certify a class, the movant must demonstrate that Rule 23(a)'s four requisites and at least one part of Rule 23(b) are met. Fed. R. Civ. P. 23(a); *see also Grimes v. Rave Motion Pictures Birmingham, L.L.C.,* 264 F.R.D. 659, 663–64 (N.D. Ala. 2010). The four requirements of Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

> Plaintiffs seek certification under Rule 23(b)(3), which requires that:

> Questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

## IV.  **ARGUMENT**

Plaintiffs, by and through their parents, state as follows:

P.D.H., J.F.P., K.R.C., and A.N.J., are residents of Alabama and seek claims for relief under Counts 2, 3, and 4. (See Third Am. Comp., Doc. 54) These Plaintiffs are members and representatives of the Alabama subclass.

E.J.B. resides in Kentucky and seeks claims for relief under Counts 1, 2, and 4. E.J.B. is a member and representative of the Kentucky subclass.

K.G.D. resides in Oklahoma and seeks claims for relief under Counts 1, 2, and 4 K.G.D. is a member and representative of the Oklahoma subclass.

A.H., and G.P. reside in California and seek claims for relief under Counts 1, 2, and 4.  A.H. and G.P. are members and representatives of the California subclass.

H.M.M. and R.A.Z. reside in Florida and seek claims for relief under Counts 1, 2, and 4.  H.M.M. and R.A.Z. are members and representatives of the Florida subclass.

L.M. resides in Idaho and seeks claims for relief under Counts 1, 2, and 4. L.M. is a member and representative of the Idaho subclass.

E.W., and M.R.S. reside in Massachusetts and seek claims for relief under Counts 1, 2, and 4.  E.W., and M.R.S. are members and representatives of the Massachusetts subclass.

R.L.M. and C.L.Y. reside in Ohio and seek claims for relief under Counts 1, 2, and 4. R.L.M. and C.L.Y. are members and representatives of the Ohio subclass.

For the reasons explained below, Plaintiffs satisfy the requirements of Federal Rules of Procedure Rule 23(a) and (b)(3), and the Class should be certified.

**A.     Plaintiffs Satisfy The Requirements Of Rule 23(a).**

**1.  The Proposed Class Is So Numerous That Joinder Is Impracticable.**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. The Eleventh Circuit has stated:

> Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class.... Finally, at least one court has recognized that where the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1).

*Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 930 (11th Cir.1983) (citations omitted). "Practicability of joinder depends on many factors, including for example, the size of the class, ease of identifying its numbers and determining their addresses, [and] facility of making service on them if joined and their geographic dispersion." *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 878 (11th Cir. 1986).

There is no bright-line number of plaintiffs to satisfy the numerosity requirement, but "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986); *see Zeidman v. J. Ray McDermott Co.,* 651 F.2d 1030, 1038 (5th Cir.1981) ("[N]o definitive pattern has emerged under Rule 23(a)(1) in terms of the number of purported class members. Indeed, classes with as few as twenty-five or thirty members have been certified by some courts.").

The class representative is not required to establish the exact number in the proposed class. *Tolbert v. Western Elec. Co.,* 56 F.R.D. 108, 113 (N.D.Ga.1972). "Plaintiffs must show some evidence of or reasonably estimate the number of class members." *Hively v. Northlake Foods, Inc.,* 191 F.R.D. 661, 666 (M.D.Fla.2000) (citing *Barlow v. Marion County Hospital Dist.,* 88 F.R.D. 619, 625 (M.D.Fla.1980)).

Although it is not possible to quantify the precise number of Class members, a Fisher-Price document shows Sleeper sales in excess of forty (40) in each state represented in this case. (Ex. 7)

### 2.  The Case Presents Common Questions Of Law Or Fact.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Plaintiffs must show that class members share common questions of law or

fact. Fed.R.Civ.P. 23(a)(2). To do so, the plaintiffs must establish issues of law or fact common to all members of the putative class. This minimal standard merely requires an identity of some factual or legal matter among members of the class. *See Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 456 (11th Cir.1996). All questions of law or fact, however, need not be common to the class. *See Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.1986) *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). "The question of commonality in Rule 23(a)(2) overlaps significantly with the predominance requirement contained in Rule 23(b)(3)." *In re Miller Indus., Inc., Sec. Litig.,* 186 F.R.D. 680, 685 (N.D.Ga.1999).

Here, there are a number of common questions of law and fact. As set out in the Third Amended Complaint such questions center on the defective nature of the Sleeper, *i.e.*, their uniform failure to adequately prevent mold, knowledge and concealment of that defect, and Defendants' statutory and common law duties relating to its misconduct. Any one of these common issues is sufficient to satisfy the Rule 23(a) commonality requirement. *See In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation,* 722 F.3d 838, 853 (6th Cir. 2013)(issue of whether common feature was defective satisfied commonality requirement).

### 3.    Plaintiffs Are Typical Of All Class Members.

Rule 23(a)(3) requires that "the claims and defenses of the representative parties are typical of the claims or defenses of the class." "'[T]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.'" (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082).

A class representative's claims or defenses must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). In other words, there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class. *Edmondson v. Simon,* 86 F.R.D. 375, 380–81 (N.D.Ill.1980); *Senter v. General Motors Corp.,* 532 F.2d 511, 525 n. 31 (6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.06–2 at 191–92 (2d ed. 1982); 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1764 (1972).

Judged by this standard, Plaintiffs clearly present claims typical of the class. The cause of action arises from a single product and there is no variation in legal theory. That Plaintiffs may have suffered greater damage than others because of the amount paid, or not paid, for a Sleeper does not render them atypical. Differences in the amount of damages between the class representative and other class members does not affect typicality. *Ouellette v. International Paper Co.,* 86 F.R.D. 476, 480 (D.Vt.1980). That the Defendants may have a stronger defense against some Plaintiffs does not render Plaintiffs atypical. Plaintiff's claim and Defendants' defenses against that claim are not markedly different than the claims of the rest of the class. *See Irving Trust Co. v. Nationwide Leisure Corp.,* 93 F.R.D. 102, 107 (S.D.N.Y.1981) (class action by tourists against travel company for hotel switching).

Based on these experiences with their Sleepers, Plaintiffs allege on behalf of themselves and the Putative Class, that Defendants engaged in a common course of conduct in designing, advertising, distributing, and selling a product it knew was defective, and in concealing the nature of that defect from consumers. (Doc. 54) Plaintiffs specifically allege Defendants knew the Sleepers were defectively designed, caused the Mold Problems, and otherwise failed to perform as a reasonable consumer would expect. Plaintiffs satisfy the typicality requirement.

### 4. Plaintiffs And Their Counsel Will Fairly And Adequately Protect The Interests Of The Class.

Judge Acker ruled in *Vesta:*

> Increased supervision, however, does not require that plaintiffs take over the duties and responsibilities of counsel.... This court cannot expect the degree of involvement and expertise on the part of plaintiffs that defendants insist upon. As the Eleventh Circuit has held, demanding such involvement and expertise could "prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 728 (11th Cir.1987).

*In re Vesta Ins. Group Inc.,* 1999 U.S. Dist. LEXIS 22233 at *36–37.

As Your Honor observed in, *In re HealthSouth Corp. Securities Litigation*, "[d]ue process requires that no potential conflicts exist between class representatives and class members that would interfere with the representation of the class." *Wyatt v. Poundstone,* 169 F.R.D. 155, 165 (M.D.Ala.1995); *see also Warren v. City of Tampa,* 693 F.Supp. 1051, 1061 (M.D.Fla.1988), *aff'd,* 893 F.2d 347 (11th Cir.1989) ("Conflicts relating to the specific issues being litigated will bar class certification"). Plaintiffs' interests are coextensive with those of the Class because each Plaintiff and Class member has been injured or threatened with injury in the same manner by Defendants, and Plaintiffs seek relief that is identical to that which would be sought by all Class members. (Doc. 54)

Moreover, Plaintiffs have expended significant time and effort in prosecuting this case, including having their responding to written discovery requests, being deposed, and retaining experienced and competent counsel.

Plaintiffs understand and take seriously their obligations to the Class.[7] (Plaintiff Affidavits, attached as Ex. 24)

Second, Plaintiffs' counsel has extensive experience in prosecuting complex product defect actions such as this one. (*See* Decl. of J. Paul Lynn, Ex. 1). Counsel's full experience is set forth therein, and qualifies them to vigorously prosecute the action on behalf of the Class.

### B.  Plaintiffs Satisfy The Requirements Of Rule 23(b)(3).

#### 1.  Common Factual Or Legal Issues Predominate.

"Rule 23(b)(3) establishes that a class action may be maintained if 'the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . .'" *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 632 (1997). The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *quoting Amchem*, 521 U.S. at 632. To satisfy the predominance requirement, "a plaintiff must establish that the issues in the class

---

[7] Declaration of Rachael Harris, Ex. 25; Declaration of Nicole Lawley, Ex. 26; Declaration of Tequila Childers, Ex. 27; Declaration of Mollee Robinson, Ex. 28; Declaration of Katrina Hankins, Ex. 29; Declaration of Alicia Cretaro, Ex. 30; Declaration of Kevin Sanderson, Ex. 31; Declaration of Christopher Myers, Ex. 32; Declaration of Amanda Morefield, Ex. 33.

action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to *i*ndividualized proof." *Id.* (internal quotations omitted). "The fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Id.* (internal quotation marks omitted).

All questions of law or fact need not be common, though some questions must be common to the class and those questions must predominate over individual questions. *See Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.1986). The class issues subject to generalized proof must predominate over issues subject to individualized proof. *See Jackson v. Motel 6 Multipurpose, Inc.,*130 F.3d 999, 1005 (11th Cir.1997) (citing *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1557–58 (11th Cir.1989)).

Liability questions common to the class—whether the design defects in the Sleeper proximately caused mold to grow in the Sleeper and whether the Defendants adequately warned consumers about the propensity for mold growth—predominate over any individual questions. As in *Amgen,* the certified liability class "will prevail or fail in unison," *id.* at 1191.

Rule 23(b)(3) does not mandate that the Plaintiffs seeking class certification prove that each element of the claim is susceptible to class-wide proof. *Id.* at 1196.

Evidence will either prove or disprove as to all class members whether the alleged design defects promoted mold growth, and whether Defendants failed to warn consumers adequately of the propensity for mold growth in the Sleeper. *See id.; Young,* 693 F.3d at 544; *Randleman v. Fid. Nat'l Title Ins. Co.,* 646 F.3d 347, 352–54 (6th Cir.2011).

Plaintiffs' claims and those of Class members arise from a common nucleus of operative facts involving Defendants' design, manufacture, advertising, and sale of its defective product. Proof of the Sleeper's defective design will be common for the class. The claims also are based on the same legal theories and therefore require determination of the same legal issues. Therefore, common issues predominate over the individual issues.

### 2. A Class Action Is Superior To Any Alternative.

The public policy and judicial efficiency rationale behind class actions is to provide an economically feasible method of pursuing small claims. *Amchem Prods.*, 521 U.S. at 617 ("[w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" (quoting *Kaplan, A Prefatory Note,* 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969))); *Shutts*, 472 U.S. at 809 (class action can be used to pool claims of

approximately $100, which are uneconomical to litigate individually); *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 329, 339 (1980) (aggregation of small claims with maximum recovery between $400 and $900 allows class plaintiffs to seek redress). Here, given the nature of plaintiffs' claims, individual class members have an incentive to bring and control their own claims, should they choose to do so.

While "certification may induce some defendants to settle," not certifying a meritorious class action "may create similar 'hydraulic' pressures on the plaintiffs, causing them to either settle or—more likely—abandon their claims altogether." *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir. 2004). Certification is appropriate if the Court finds that "class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The same is true here. Class-wide resolution of the issues in this case will reduce litigation costs and promote efficiency for the Court as well as the litigants. The evidence which will be presented as to the design of the Sleepers — and the concealment of that defect — will not vary from one Class member to the next. Any trial on these issues — whether class or individual — will require presentation of the same evidence regarding the design defect, and Defendants' knowledge and concealment of the defect.

In sum, and as is made clear in the discussion of the four relevant considerations below, the class action device is superior because there simply are no practical or economic alternative procedures available to the parties which might be used to adjudicate these claims in a more (or even equally) fair or efficient manner.

### a. Interest Of Individual Class Members In Controlling The Litigation

There is nothing to suggest Class members have a strong interest in controlling their own lawsuits relating to the Sleepers. Such lawsuits are difficult and expensive, particularly since they involve extensive and expensive expert analysis. Having numerous lawsuits concerning the same legal and factual issues is not the best use of judicial resources or the parties' time and resources, especially in light of the uniformity and commonality of the key factual and legal issues. Should any Class member desire to control his or her own lawsuit, they will be provided notice, as discussed below, and the opportunity to opt out of the Class.

### b. THE DESIRABILITY OF CONCENTRATING THE LITIGATION IN A SINGLE FORUM

As noted above, the key factual and legal issues are uniform and common to all Class members, and turn on a common nucleus of operative facts and common legal theories. Plaintiffs and all Class members reside in States where the

Defendants advertised, distributed, warranted, and sold the Sleepers. Alabama is a central, geographic location relative to the other states in this case.

### c.    Management Difficulties, If Any, Do Not Preclude Certification.

There are no difficulties in management unique to this case that precludes certification. The factual and legal issues are premised on a common nucleus of operative facts and common legal theories, such that proof as to one is proof as to all with respect to most, if not all, issues in the case. Plaintiffs' claims and those of Class members are governed by very similar laws.

There is no meaningful alternative for the prosecution of these claims. This action provides an efficient vehicle for resolution of a controversy affecting thousands of class members in a single proceeding. Further, this product defect case is typical of other product defect cases in that it is expensive to litigate and bring to trial, whether it proceeds as an individual action or a class action. In this case, prosecution of the common issues requires resources well beyond that available to or justified for an individual class member.

The expense of individual litigation will deter class members from vindicating their rights. *See Amchem*, 521 U.S. at 617 (Rule 23(b)(3) aims to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponent into court at all.").

Indeed, the United States Supreme Court and this Court both have observed that due to such expense, the realistic alternative to this type of class action is not multiple individual suits, but zero individual suits. *Amchem*, 521 U.S. at 617 ("[T]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

Moreover, even if possible, the litigation of thousands of individual cases would unnecessarily burden the courts. Adjudicating Plaintiffs' claims in the form of class action is more efficient than overwhelming the court system with hundreds or thousands of complex individual actions. By essentially consolidating thousands of potential individual actions, the class action device here will enable the Court to manage this litigation in the most efficient way, minimizing the time, effort, and expense for both the litigants and the judiciary.

## V. <u>CONCLUSION</u>

Plaintiffs respectfully submit that this is a paradigmatic case for class certification. Defendants sold the Sleeper to hundreds of thousands of consumers across the country that it knew were uniformly defective in that they developed Mold Problems. Rather than disclose that knowledge to consumers so they could make an informed choice between the benefits and downside of front-loader washers, Whirlpool opted to conceal that information from everyone in the chain

of distribution prior to the time of sale. When consumers experienced Mold Problems, Defendants blamed the problem on the consumers, sought to shift the burden of dealing with it to them by way of arduous cleaning process that only temporarily mitigates the problem. A class action is the only way to hold Defendants accountable and provide relief to these consumers.

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification.

Respectfully Submitted this the 21st day of March, 2014.

/s/ J. Paul Lynn
Donald W. Stewart, Esq.
J. Paul Lynn, Esq.


OF COUNSEL:

Donald W. Stewart, Esq.
J. Paul Lynn, Esq.
**STEWART & STEWART, P.C.**
1826 3rd Avenue North, Suite 300
Bessemer, Alabama 35020
Phone:   (205) 425-1166
Fax:     (205) 425-5959

Andrew P. Campbell, Esq.
Stephen D. Wadsworth, Esq.
**LEITMAN, SIEGAL, PAYNE & CAMPBELL, P.C.**
420 20th Street North, Suite 2000
Birmingham, Alabama 35203
Telephone:   (205) 251-5900

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following; and I hereby certify that I have mailed by United States Postal Service the document to the following, on this the 21st day of March, 2014:

James C. Huckaby
Richard E. Smith
Sharon D. Stuart
**CHRISTIAN & SMALL, LLP**
505 20th Street North, Suite 1800
Birmingham, AL 35203

Erik K. Swanholt, Esq.
**JONES DAY**
555 S. Flower Street, 50th Floor
Los Angeles, California 90071-2300
Telephone: (213) 489-3939

Hugh R. Whiting, Esq.
**JONES DAY**
901 Lakeside Ave.
Cleveland, Ohio 44114-1190
Telephone: (216) 586-3939

Peter Biersteker, Esq.
**JONES DAY**
51 Lousiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939

*Counsel for Defendants*

/s/ J. Paul Lynn
OF COUNSEL